WILLIAM J. HAAG AND EDITH C. HAAG, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

E. B. SEWALL MANUFACTURING COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91191, 91192. Filed June 4, 1963.

*Dennis D. Daly* and *Fred A. Kueppers*, for the petitioners.
*Marvin F. Peterson*, for the respondent.

HOYT, *Judge:* The respondent determined deficiencies in petitioners' income taxes for the years 1956, 1957, and 1958, as follows:

| Docket No. | Year | Amount |
| --- | --- | --- |
| 91191 | 1956 | $338. 92 |
|  | 1957 | 110, 313.88 |
|  | 1958 | 425. 22 |
| 91192 | 1956 | 6, 280. 94 |
|  | 1957 | 2, 104. 56 |
|  | 1958 | 1, 205. 93 |

As a result of concessions by both parties in the pleadings, at the trial, and on brief, most of the issues have been determined. The principal issue remaining for decision is whether the petitioners in Docket No. 91191 received taxable income in 1957 when they purchased property worth $150,000 from the E. B. Sewall Manufacturing Co. for $72,000. It is conceded that the related issue in Docket No. 91192 of whether the Sewall Co. may deduct $13,611.29 in its 1958 fiscal year will be resolved by the determination of this principal issue. If no taxable income is found, then section 267 of the 1954 Code forbids any deduction, but if taxable income is found then it is conceded that the company may take the deduction.

Some of the facts have been stipulated and are so found.

William J. Haag and Edith C. Haag, petitioners in Docket No. 91191, are husband and wife residing in St. Paul, Minn. The E. B. Sewall Manufacturing Co., petitioner in Docket No. 91192, is a Minnesota corporation with its principal office in St. Paul, Minn. The petitioners filed their income tax returns for the years in question with the district director of internal revenue for the district of Minnesota. William J. Haag will be referred to hereinafter as Haag, and E. B. Sewall Manufacturing Co. will be called Sewall Co. or Sewall.

The Sewall Co. kept its records and reported its income on the accrual method and filed its returns for the fiscal year ending June 30. Haag kept his records and reported his income on the cash basis for the calendar year.

With the exception of one qualifying share, Haag and E. B. Sewall were the sole shareholders of the Sewall Co. Haag owned 416 shares representing 40.82 percent of the common stock and was vice president of the company. He was also in charge of the corporation's financial matters. As the majority shareholder, owning approximately 60 percent of the issued stock, E. B. Sewall served as president and was in charge of the corporation's shop.

For many years the Sewall Co. had rented the real estate used for its manufacturing business from Haag. In 1951 it was in need of additional production facilities as well as working capital. Unsuccessful efforts were made to obtain loans through commercial channels. Thereafter application was made to the Reconstruction Finance Corp. for a loan in the amount of $150,000, and the loan was authorized in 1952. The granting of this loan was conditioned on the acquisition of title by the Sewall Co. to the real estate previously rented from Haag. It was also specified that substantial improvements to the real estate be made.

Since the company had no cash, the acquisition of the property became a problem. The RFC would not approve a sale for promissory notes because this would increase the corporate liability, and E. B. Sewall did not want to lose control of the corporation by issuing common stock to Haag for the property. After negotiation it was decided that Haag would convey the realty to Sewall in exchange for preferred stock and an assumption of the existing mortgage, with an option given to Haag to reacquire the property when the RFC loan was paid off.

On August 6, 1952, Haag and Sewall entered into an agreement entitled "Agreement To Sell And Option To Repurchase Real Estate,"

and Haag contemporaneously deeded the property to Sewall. In consideration for the transfer Sewall accepted the property subject to a $22,000 mortgage, which it assumed, and issued to Haag preferred stock with a par and actual value of $52,000. Haag was given the option under the agreement to repurchase the property just as soon as the loan was repaid, and for 1 year thereafter, for the same amount at which he sold it, $74,000. It was then known by the parties that substantial improvements would be made with part of the loan proceeds. It was also provided in the agreement that Sewall could not sell the property, or any part thereof, to anyone other than Haag and that he might pay any part of the repurchase price by signing over the preferred stock to the corporation at its par value. Thus the right of Haag to reacquire the property was assured, and the value of this stock was pegged between the parties, and Haag was guaranteed the right to use this stock to repurchase under the option at the same price.

Shortly after this transfer it became necessary for Haag to pay $2,000 toward the reduction of the mortgage, and as a result the option agreement was amended on August 27, 1952, to reduce the option price to $72,000. The value of the property at the time of transfer on August 6, 1952, was $72,000, as follows:

| | |
|---|---|
| Building No. 1 | $2,000 |
| Building No. 2 | 10,800 |
| Building No. 3 | 18,000 |
| Building No. 4 | 25,000 |
| Land | 16,200 |
| Total value | 72,000 |

The petitioners reported the sale and option to repurchase transaction with Sewall on their 1952 income tax return as follows:

| | |
|---|---|
| Computation of sales price below mortgage assumed by purchaser | $20,000.00 |
| Value of stock given in exchange | 15,312.44 |
| Total sales price | 35,312.44 |
| Factory building at 649 Glendale St., St. Paul, Minn., acquired 11-1-42, Sold 8-6-52: | |
| Sales price | 35,312.44 |
| Depreciation allowed | 13,253.61 |
| Cost | 48,566.05 |
| Gain or loss | None |

No value for the so-called "option" was reported as consideration or as having been received as part of the purchase price for the sale.

As further conditions of obtaining the loan from RFC, the Sewall Co. was required to use the loan proceeds as follows:

(a) $70,000 to construct Building No. 5 which was an addition to Building No. 4.

(b) $20,000 to pay off the current mortgage on the property.

(c) $60,000 for current operating expenses.

Upon transfer of the property from Haag to Sewall Co. and acceptance by Sewall Co. of the specified conditions, the RFC granted a loan of $150,000 to Sewall which was evidenced by a promissory note and secured by a first mortgage on the property. Under the terms of the note and mortgage, the principal was to be repaid at a minimum of $2,500 a month for a period of 60 months with interest payable in addition thereto.

After the loan was received, the Sewall Co. improved the property by making an addition to Building No. 4, which is know as Building No. 5. The cost of improvements and additions to the property totaled $92,741.59, and of this sum $42,044.19 was spent in the remaining 4 months of 1952 and $47,923.57 was spent the following year. During the 5-year period of the loan, Sewall Co. paid all taxes, insurance, and other expenses of maintaining the property.

Sewall repaid the RFC loan as follows:

| Year of payment | Amount |
|---|---|
| 1952 | $2, 500. 00 |
| 1953 | 30, 000. 00 |
| 1954 | 30, 950. 00 |
| 1955 | 30, 782. 00 |
| 1956 | 31, 426. 23 |
| 1957 | 24, 341. 77 |
| | 150, 000. 00 |

The final payment was made in August of 1957 and Haag immediately notified Sewall of his intention to exercise his option. He repurchased the property on September 1, 1957, and the same day agreed to lease the property once again to Sewall for $1,800 per month beginning that date. He had not received any rent or other compensation for use of the property during the 5 years in which the Sewall Co. had title.

The Sewall Co. received $72,000 in consideration for the conveyance to Haag of the property free and clear of any indebtedness. This was exactly what had been paid for the property 5 years before. The consideration consisted of the preferred stock, which had an agreed valuation equal to its then par value and fair market value of $52,000, $15,600 of accrued but undeclared dividends on the preferred stock, plus $1,872 interest accrued on the dividends, and Haag's check for $2,528. On September 1, 1957, the Sewall Co. had an income tax basis for this property of $85,611.29, but the fair market value of the property was then $150,000, as follows:

| | |
|---|---|
| Building No. 1 | $1, 500 |
| Building No. 2 | 11, 500 |
| Building No. 3 | 19, 500 |
| Building No. 4 | 27, 000 |
| Building No. 5 | 69, 500 |
| Land | 21, 000 |
| Total value | 150, 000 |

ULTIMATE FINDINGS OF FACT

When Haag received his property back in 1957 with the improvements and additions thereon and with an accordingly increased valuation at the price agreed upon by the parties 5 years before, he received ordinary taxable income of $78,000, the difference between the then value of the property and the prearranged bargain price he was enabled to pay.

OPINION

It is well settled that our taxing system has ordinarily treated an arm's-length purchase of property as a nontaxable event, even though the purchase price is more or less than the value of the property purchased. *Commissioner* v. *LoBue*, 351 U.S. 243 (1956) ; *Palmer* v. *Commissioner*, 302 U.S. 63 (1937) ; *Elverson Corporation*, 40 B.T.A. 615 (1939), affd. 122 F. 2d 295 (C.A. 2, 1941). Under this general rule taxable income does not accrue until the purchaser sells or otherwise disposes of the property. *Palmer* v. *Commissioner, supra.*

It is equally well established that in the tax field the outward appearance of a transaction is not always determinative of its true character. The veil of form is often lifted in order to scrutinize carefully the entire transaction. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), affirming 2 T.C. 531 (1943) ; *Shoenberg* v. *Commissioner*, 77 F. 2d 446 (C.A. 8, 1935), affirming 30 B.T.A. 659 (1934) ; *Jacobs* v. *Commissioner*, 34 F. 2d 233 (C.A. 8, 1929). This principle has been applied by both the courts and the regulations to a purchase at a bargain price when the parties involved have a special relationship such as stockholders [1] or employees.[2]

In *Commissioner* v. *LoBue, supra*, the Supreme Court found that a stock option arrangement, although in the form of a purchase, was actually compensation, and in language particularly appropriate to the instant case stated:

But that is not to say that when a transfer which is in reality compensation is given the form of a purchase the Government cannot tax the gain under § 22(a). [Sec. 61(a), 1954 Code.] The transaction here was unlike a mere purchase. It was not an arm's length transaction between strangers. Instead it was an arrangement by which an employer transferred valuable property to his employees in recognition of their services. We hold that LoBue realized taxable gain when he purchased the stock.

We feel that we must examine carefully the substance rather than the form of the transaction in this case. Was the transfer here in reality compensation? Although the legal document is entitled a sales and option agreement, and the parties are related as corporation

---

[1] Sec. 1.301–1(j), Income Tax Regs.; *Lester E. Dellinger*, 32 T.C. 1178 (1959) ; *Elizabeth Susan Strake Trust*, 1 T.C. 1131 (1943).

[2] Sec. 1.61–2(d)(2), Income Tax Regs.; *Commissioner* v. *Smith*, 324 U.S. 177 (1945) ; *Albert Russel Erskine*, 26 B.T.A. 147 (1932).

and stockholder, the significant preexisting relationship is that of lessor and lessee. Haag rented the property to the corporation before the 1952 transfer and also after he reacquired the property in 1957. When it became necessary for the Sewall Co. to hold title to the property, a substitute for the rental payments was devised. Since the corporation had no cash, the low option price was a favorable alternative. During the negotiations it became clear that E. B. Sewall, the majority stockholder, would not give up control of the company to get the loan. In like manner, the minority shareholder, Haag, was not willing to give up 5 years rent in order to obtain the loan for the company.

Although he was repeatedly pressed for an explanation of why the low option price was agreed upon, the only reasons given by Haag at trial for the inordinately low option price were that the company would be benefited by obtaining the needed loan, and that he would not have been interested in an option if he had no idea what he was going to pay for the property. E. B. Sewall also had no explanation as to why the company granted the bargain price option with all the facts known. He merely stated that the RFC loan would be beneficial because of the corporation's needs and that they felt "it was a good deal for the company at that time." We can only conclude, as we have, that it was for the purpose of compensating Haag for the corporation's use of the property and for his loss of rental income during the time title was held by the Sewall Co.

In place of rent over the 5-year period, Haag in effect received $15,600 in dividends on the preferred stock he acquired in 1952 and $1,872 in accrued interest thereon, plus the $78,000 of added value to the property. When spread over the 5-year period, this amounts to approximately $1,600 per month, if no interest factor is considered. Taking into account that Haag was also relieved of the costs of insurance, taxes, and maintenance during this period, the total he received is obviously comparable to the new rental of $1,800 per month at which the property was rerented to Sewall immediately upon exercise of the option.

Although not argued by the parties, our holding here would preclude the exclusion afforded by section 109 of the 1954 Code.

Petitioners argue that if a sale and repurchase is not found the transaction should be treated as a loan of the property with the option serving as the payment for the loan. They contend that the payment occurred in 1952 when the option was received and not on its exercise in 1957. We are unable to concur in this line of argument. It is undisputed here that the market value of the property and the option price were the same when the option was given. The record convinces us that the parties did not contemplate or intend that the "option" was given to compensate Haag for the use of his property by Sewall

494

for the 5-year period. It was merely a mechanical device to insure the return of his property to Haag after the RFC loan had been paid off. The intention of the parties was to compensate Haag for the use of his property by returning the improved and more valuable property to him at the end of the term when the "option" was exercised. The option itself was merely a cog in the financial arrangement machinery; it had no economic significance when granted.

The significant economic event occurred when Haag exercised his right to repurchase the improved and more valuable property at the predetermined bargain price. This was the taxable as well as the economic event and the substance of the entire transaction, of which the "option" was merely an incidental mechanical step. Even if we found the option to be bona fide and exactly what it purports to be, which we do not, it was not intended to be compensation until its exercise in 1957, and therefore the bargain purchase is taxable in that year. Cf. *Commissioner* v. *Smith*, 324 U.S. 177 (1945). The petitioners' reliance upon stock-option cases holding that some such options constitute compensation when received is misplaced, and the cases relied upon are distinguishable. We hold, instead, that the "option" was not bona fide, as such, but simply a part of the financial arrangement by which Haag was to be compensated for the loss of rent and for the use of his property until the loan from RFC was repaid.

We hold here that the transfer of the improved real property at a bargain price in 1957 has the characteristics of a deferred rental payment or other compensation for the use of petitioners' property and that the difference between the price paid and the then value of the property is taxable as income under section 61(a) of the Internal Revenue Code of 1954. Since the taxpayer is on the cash basis and the payment was not received by him until 1957, it is taxable in that year. Sec. 451(a), I.R.C. 1954.

We also hold, as the parties have agreed, that in view of our holding that the petitioners in Docket No. 91191 received compensation the Sewall Co. is entitled to a deduction of $13,611.29 for its 1958 year.

*Decisions will be entered under Rule 50.*